UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

United States of America,                          File Nos. 0:22-CR-00297-DWF-DTS

              Plaintiff,                            **DEFENDANT'S POSITION WITH
                                                    RESPECT TO SENTENCING**

       v.

Darrian Nguyen,

              Defendant.

_____

## INTRODUCTION

Defendant Darrian Nguyen submits this memorandum in support of his request for a sentence of 60 months, which is sufficient but not greater than necessary to accomplish all the goals of sentencing. Mr. Nguyen possessed drugs and guns illegally and he has accepted responsibility for those crimes. Mr. Nguyen is guilty of his possessory offenses, but he is not a terrorist. When the Court considers all of the statutory sentencing factors in this case, Mr. Nguyen prays the Court will agree that sixty months in prison is the appropriate sentence for Mr. Nguyen.

## FACTS

**1. Characteristics of Darrian Nguyen.**

   **a. Summary**

Darrian is a 50-year-old man facing his first felony convictions in life. He was born in Ho Chi Minh City, Vietnam in 1972, and is a naturalized United States citizen. (PSR ¶ 56, 68.) He emigrated to the United States as a small child with his parents in 1975

1

as the family fled Vietnam. (*Id.*)

Mr. Nguyen's family fled Vietnam because his father was a doctor and a major in the South Vietnamese Army who had aided the United States during the war. (PSR ¶ 60.) It is plainly evident from the PSR, and Dr. Boswell's Report, that Mr. Nguyen was very proud of his father, looked up to his father, and had a great sense of patriotism for the United States instilled him by his father. It is also clear from the documents in this case that due to an untreated schizotypal personality disorder, methamphetamine addiction, the influence of the CHS, and the internet, that Mr. Nguyen's sense of patriotism led him to some dark places that his father would not have been proud of.

However, it is also clear Mr. Nguyen was never a terrorist, nor did he ever join a militia nor attend a rally, and he never made any plans to harm anyone.

### b. Childhood.

Despite his father's accomplishments and contributions, Mr. Nguyen grew up in a chaotic and abusive household. (PSR ¶ 61.) His father was a disciplinarian, but his mother was severely mentally ill, "throwing dishes around their home and forcing the defendant and his brother to clean up the shattered pieces," and having exorcism rituals. (PSR ¶ 61.) The behavior also included a knife-wielding incident, and threatening the children and the senior Mr. Nguyen. (Report at 1-2.) Mr. Nguyen looked forward to school each day to escape the household chaos. (*Id.*)

After his parents separated, the children split their time between two homes until Mr. Nguyen's father eventually obtained full custody. (PSR ¶ 62.) Mr. Nguyen was a fairly good student in high school, did not get into much trouble, and attended college for two

years in pursuit of an engineering degree. (PSR ¶ 82, Report at 3-4.) Mr. Nguyen speaks

four languages: English, Vietnamese, French and German. (PSR ¶ 83.)

### c. Prior Work History and Adult life.

Until the pandemic, Mr. Nguyen worked his entire life. He worked primarily as a

Bartender, but has also held a license as a manicurist, and worked as a cook and driver as

well. (PSR ¶ 87, 88.) At the time of his arrest, he also acted as a personal care attendant for

his elderly mother. (PSR ¶ 86.) However, after being laid off as a bartender during the

pandemic, Mr. Nguyen's addiction to methamphetamine descended to a darker place. (PSR

¶ 87.) Collateral interviews noted that the home he cared for his mother in was clean and

well kept in 2016, but by the time of his arrest, it had become otherwise. (Report at 16.)

Mr. Nguyen was the primary caregiver for his mother, who was suffering from

dementia and blindness, as well as her life-long mental health issues, at the time of his

arrest. (Report at 4.) He "continues to be quite concerned about his mother's health."

(Report at 8.) While the home was not a picture of cleanliness, Mr. Nguyen certainly did

the best he could to care for his mother while suffering from untreated mental and chemical

health issues of his own. (*Id.*) She has since been placed in assisted living. (Report at 14.)

There, she was diagnosed with schizophrenia. (Report at 16.)

Mr. Nguyen estimates he likely worked for over forty different establishments in

his thirty-year career as a bartender and nightclub staff person. (*Id.*) Mr. Nguyen was

briefly married, and has dated sporadically throughout his adult life. (*Id.*) He was in a five-

year relationship with a woman at the time of his arrest, but advised her to "move on with

her life due to his legal problems" after indictment. (*Id.*) Despite the circumstances of his

childhood, Mr. Nguyen has never been violent in relationships, and has no history of domestic abuse convictions.

Additionally, collateral interviews noted that "in all their discussions, [Nguyen] never expressed any aggressive, violent, or radical political beliefs." (Report at 8.) Mr. Nguyen's father died in 2021, and the overwhelming grief from that combined with the isolation caused by the pandemic drove Mr. Nguyen to the darkest recesses of his mind, as well as the internet.

### d.  Mental and Chemical Health.

At the time of the offense conduct, Mr. Nguyen was suffering from untreated schizotypal personality symptoms, likely inherited from his schizophrenic mother. (Report at 20.) After his father's death, and the onset of the pandemic, "Mr. Nguyen's overall psychological functioning suffered a calamitous decline over the last few years." (Report at 17.)

While Defendant was using methamphetamine on a daily basis as well, Dr. Boswell notes that "Mr. Nguyen's methamphetamine use alone does not explain his pattern of mental health symptoms and functioning." (Report at 19.)

> The available clinical evidence suggests Mr. Nguyen was predisposed to mental health illness via genetic contributions from his mother who is positive for schizophrenia. The current examiner opines the combination of anxiety, stress associated with taking care of his disabled mother, and schizotypal personality disturbance resulted in the gradual deterioration in his thinking and functioning.
>
> Further, the examiner opines there is no credible independent evidence to

> suggest his actions related to the current charges were the result of antisocial personality, political hostility, racial hatred, or desire to engage in radical violent behavior. In fact, evidence from the personality testing indicated scores relevant to physical, verbal, and attitudinal aggressive characteristics were all significantly below the norm of the general population.

(*Id.*) He began experiencing auditory and visual hallucinations in his teenage years, and those have continued on and off throughout his life. (Report at 5.) However, he has never received any meaningful mental health treatment prior to his arrest. He has received some modest mental health care while in custody. (Report at 6.)

Additionally, "Mr. Nguyen was an extremely trusting individual who had been manipulated by others in the past" and who was introduced to both militia propaganda and the idea of buying auto sears or automatic weapons entire by the confidential informant used in this case. (Report at 19-20, PSR.) Media coverage of this case has negatively impacted his mental health and physical safety while in custody as well. (Report at 6.) Mr. Nguyen is "highly anxious, vigilant, and fearful that his life is now in danger." (Report at 17.)

Mr. Nguyen also hoarded various items, and has been accused of hoarding in food while in jail as well. (Report at 14.) This hoarding behavior helps explain why the number of firearms in this case is not as concerning as it may be in some cases.

Mr. Nguyen also has a problematic use history of primarily alcohol and methamphetamine. (Report at 13.) At the time of his arrest, he was using methamphetamine daily. He has completed the substance abuse education program while in custody. (*Id.*) Dr. Boswell makes a number of appropriate recommendations for Mr. Nguyen to help him

finally receive the mental health care he has likely always needed. (*Id.* at 18-19.)

**2. Pertinent Aspects of the Criminal Proceedings.**

**a. Time in Custody.**

Mr. Nguyen has been detained since his initial arrest in this matter. Mr. Nguyen's time in custody has been exceedingly difficult for him due to his mental health, anxiety, concern for his mother, and the constant threat to his safety as a result of news coverage of this case. Mr. Nguyen has been attacked and assaulted repeatedly in custody. He has attended multiple meetings with counsel while bearing black eyes and cuts to his face. He has not defended himself, and has not fought back against such attacks. One "altercation involved the defendant and his cellmate, and the incident summaries appear generally consistent with the defendant's version as it was noted he was found sitting on the floor with blood on his face and his roommate only sustained injuries to a hand." (PSR at A.2 ¶3.) His time in custody, and the fact he has not used force even in justified self-defense, demonstrate that in reality, Mr. Nguyen is a non-violent person, despite his paranoid thinking, firearm hoarding, and consumption of repugnant internet political rhetoric.

In custody, he has "received death threats and has experienced significant decline in his overall psychological functioning." (Report at 19.) Despite this, Mr. Nguyen has completed numerous courses in custody and participated in mental health programming as well. He has taken and completed courses on psychological education, dialectical behavioral therapy, trauma, grief and loss, and a 20-week course on substance abuse. That he has sought to better himself as much as possible during pretrial detention is a testament to his desire never to return to the dark place the FBI found him in.

**b. Acceptance of Responsibility.**

Mr. Nguyen pleaded guilty, and in his PSR interview he readily admitted possession of all the illegal items in his home, including separately acquired quantities of methamphetamine which he would also re-sell in small quantities, other drugs, and unregistered NFA items, e.g. auto-sears, and two short-barreled firearms. Mr. Nguyen also acknowledged that he "was consuming a lot of news coverage from far-right media sources and absorbed narratives from supports of former President Trump … [but] he never contributed money to campaigns, attended …rallies, considered attending a rally on January 6, 2021, or [otherwise] supported any far-right groups." (PSR ¶ 20.) He also never had plans to build bombs nor to hurt anybody. (*Id.*)

Mr. Nguyen was fulsome and truthful in the PSR interview, and told the probation interviewer that "he is remorseful and ashamed for what he did, and in reflection he now knows he was on the wrong path. He described being like a caterpillar shedding its skin to become a beautiful butterfly, and he knows a butterfly would never want to return to its former self." (*Id.*) Mr. Nguyen is embarrassed and ashamed not only of his crimes, but of the ideological and political detritus he absorbed from the CHS and the internet, and repeated back to the CHS to impress him.

Mr. Nguyen does not dispute that he possessed the various writings in his home, nor the conspiratorial and far-right internet content on his cell phone. He has only disputed the drug quantity seized from his home (he turned out to be right), and whether he ever made or expressed any real plans to harm anyone. That his untreated mental health issues, grief over the loss of his father, combined with drugs and political propaganda brought him to a

very dark, sad, and lonely place is no surprise. That he expresses a resolute desire never to return to that place, demonstrated by his pro-social developments and programming while in custody, is a mitigating, not aggravating factor in this case.

Mr. Nguyen should receive the full three-point reduction for acceptance of responsibility.

### c. Offense Conduct.

Mr. Nguyen possessed a total of 221.5 grams of methamphetamine. He was charged originally with possessing more than double that, or 487 grams of methamphetamine, but after the defense hired an expert to observe the BCA weighing procedures, the discrepancy between initial law enforcement weighing and correct weighing at the BCA was discovered by the parties. Not all of the drugs then underwent quantitative analysis. Of the 221.5 grams, analysis by the BCA resulted in "137.7 grams of actual methamphetamine, 31.2 grams of methamphetamine mixture, 18.5 grams of cocaine, and 3.2 grams of MDMA." (PSR ¶ 20.)

Mr. Nguyen also possessed a number of illegal firearms, or unregistered "NFA items," all of which he received at various times directly from the confidential informant in this case. (PSR ¶ 16.) Among those items were several auto-sears, a shotgun, and a rifle each with barrels that were too short, "but it appears the remaining firearms were lawfully possessed." (PSR ¶ 16.) While that may not be entirely accurate, given the drugs involved, the remaining firearms were not unregistered NFA items. Many of the remaining firearms were also sold to Defendant at various times by the informant prior to him becoming an informant. (PSR ¶ 20.) The informant was an illegal arms dealer and militia member. Mr.

8

Nguyen was a bartender and meth addict who sold small amounts and hoarded many things, including firearms. Prior to his involvement with the CHS, and consumption of a former President's and his followers' propaganda on the internet, Mr. Nguyen never had any political inclinations or involvement.

It should be noted that what has been occasionally mislabeled as a "grenade launcher" was in fact not illegal, not an NFA item, and not a grenade launcher. There also were no grenades recovered. Grenades are illegal. 40mm projectile launchers can be purchased legally on the internet for $200 and do not require NFA registration. While the device looks scary attached to a rifle, it is not otherwise illegal, and not a destructive device. Various websites sell 40mm flares and fireworks that one can shoot from it.

While there is no dispute that Mr. Nguyen got "fired up" by a former president's rhetoric surrounding the search of his home, there is also no dispute that all of the most salacious quotes attributed to Mr. Nguyen by the informant were from a single alleged day wherein the recording device "failed." (PSR ¶ 10.) There is zero credible evidence that Mr. Nguyen ever stated he was going to harm anyone, and these alleged statements are derived entirely from the informant in this case who is known by law enforcement to actually be a real member of a militia, as well as the supplier of the firearms, and the militia flag to Mr. Nguyen.

> The only evidence connecting Mr. Nguyen with the group in question was
> information provided by the CHS, and the only person Mr. Nguyen knew
> who a member of the three-percenter militia was the CHS. Mr. Nguyen
> received the flag in his garage from the CHS, as well as most of his
> firearms at various times. It is important to note the most salacious

statements attributed to Mr. Nguyen by the confidential informant occurred
the day the recording device failed to function properly. Thus, these
statements are unsupported allegations.

(Report at 17.) This "uncorroborated information provided by the confidential informant is
highly questionable at best." (Report at 19.) The "only person in [Nguyen's] life with ties
to extremist and militia groups was the CHS." (PSR ¶ 20.) The "confidential informant
played a substantial role in persuading Mr. Nguyen to accept the weapons as payment …
which resulted in the current criminal charges." (Report at 17.)

Notwithstanding the influence of the CHS on Mr. Nguyen, it is only Mr. Nguyen
who was indicted, and it is Mr. Nguyen who accepts responsibility for the crimes he
committed.

DISCUSSION

**A.  Starting Guidelines Calculation.**

Counts 1 and 2 are grouped pursuant to USSG 3D1.2(c), and the offense level is the
higher of the two, which in this case is Count 1.

As to Count 1, having pleaded guilty to a violation of 21 USC §§ 841(a)(1), the
applicable Guideline is USSG §2D1.1. The minimum term of imprisonment allowed by
law is 5 years. 21 U.S.C. § 841(b)(1)(B). As to Count 1, the PSR calculates the base offense
level as 30. (PSR ¶ 2; USSG §2D1.1(c)(4), (c)(7).) The base offense level would be 26 if
the methamphetamine that was of high purity were treated as mixture. *Id.* It is on this basis
that Mr. Nguyen primarily seeks a variance from the Guidelines.

As to Count 1, the parties agreed a 2-level increase applies because a dangerous

weapon was possessed, pursuant to USSG §2D1.1(b)(1), making the offense level either 28 or 32. With adjustment for acceptance, the adjusted offense level is therefore either 25 (mixture) or 29 (actual) as to Count 1.

As to Count 2, the parties agreed the base offense level is 18 because the offense involved a firearm described in 26 U.S.C. § 5845(a), pursuant to USSG §2K2.1(a)(5). The parties agree a 2-level increase applies because the offense involved 3 firearms, pursuant to USSG §2K2.1(b)(1)(A). A 4-level increase applies because the defendant possessed a firearm in connection with another felony offense, pursuant to USSG §2K2.1(b)(6)(B). The PSR also assessed an additional two-level increase, making the offense level 26 instead of 24 as contemplated by the parties. However, this is immaterial because with the adjustment for acceptance of responsibility, the final offense level for Count 2 is 23, and thus still lower than either potential offense level for Count 1.

With a three-level adjustment for acceptance, the combined total offense level is either 25 (mixture) or 29 (actual). The parties agreed the counts are grouped, pursuant to USSG §3D1.2(c), (d). If the total offense level is 25, coupled with a criminal history category of I, the advisory guideline range would be 57 to 71 months imprisonment. Mr. Nguyen requests a sentence of 60 months.

The mixture/actual disparity justifies using the lower of the two drug Guidelines ranges; the characteristics of Mr. Nguyen, and how he has handled – without violence – the especially hard time in pretrial detention justify a sentence at the low end of that range. The mandatory minimum makes the appropriate end point 60 months.

**B.    The Parsimony Provision and Crafting an Individualized**

**Sentence under § 3553(a) after *Booker* and *Gall*.**

Because the District Court is in a uniquely "superior position to find facts and judge their import under § 3553(a)," the Appellate Courts must now review all sentences under an abuse-of-discretion standard, regardless of whether the sentence is inside or outside the Guidelines range. *Gall v. United States*, 128 S.Ct. 586, 597 (2007). The Supreme Court has rejected the notion that extraordinary circumstances are required to justify a sentence outside the Guidelines range. *Id*. at 595.

The Supreme Court also rejected "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence. *Id*. So long as sentences that differ from the Guidelines are justified, a sentencing court's decision stands unassailable on appeal. *See, e.g., United States v. Jiminez-Gutierrez*, 491 F.3d 923 (8th Cir.2007)(affirming substantial downward departure that was justified on record, and noting that even where circuit courts disagree with the degree of a trial judge's departure, the discretion to make such decisions is within the sole province of the District Court); *United States v. Gonzalez-Alvorado*, 477 F.3d 648, 650 (8th Cir.2007)(noting that a sentence that varies from the Guidelines range is reasonable so long as the judge offers appropriate justifications under § 3553(a) factors).

In the post-*Booker* era of federal sentencing, the "Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 129 S.Ct. 890 (2009). Even pre-*Booker*, it was "uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate,

sometimes magnify, the crime and punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).

It is now incumbent on the sentencing court to "make an individualized assessment based on the facts presented" in each case. Gall, 128 S.Ct. at 602 (2007). District Courts "may not presume that the Guidelines range is reasonable." *Id*. at 597. The Supreme Court in *Booker* held that the United States Sentencing Guidelines are advisory and that District Courts must examine all the § 3553(a) factors in order to impose a sentence "sufficient, but not greater than necessary" to accomplish the goals of sentencing. *United States v. Booker*, 543 U.S. 220 (2005). The ensuing trio of 2007 Supreme Court cases made clear that district courts must fashion individualized sentences based on the unique facts and circumstances of each case, and that the Guidelines do not enjoy a presumption of reasonableness. *See Gall v. United States*, 128 S.Ct. 586, 602 (2007)(probationary sentence substantially outside of Guidelines was reasonable and justified); *Kimbrough v. United States*, 128 S.Ct. 558, 570 (2007)(sentencing courts may depart from Guidelines range based solely on policy considerations, including disagreements with Guidelines sentencing policies); *Rita v. United States*, 127, S.Ct. 2456, 2465 (2007)(sentencing courts may vary based on arguments that Guidelines sentencing range itself fails to comport with § 3553(a) factors). The thrust of *Booker* and its progeny is "that the District Court is free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." *Kimbrough*, 128 S.Ct. at 577 (Scalia, J., concurring).

As the Court is well aware, it has the authority to vary from the Guidelines after due consideration. "The court shall impose a sentence sufficient, but not greater than necessary,

to comply with the purposes" of sentencing. 18 U.S.C. § 3553. "The court, in determining the particular sentence to be imposed, shall consider… the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

1. **History and Characteristics of Mr. Nguyen.**

    a. **Drug Addiction and Mental Health.**

 Mr. Nguyen's history of drug addiction and self-medicating (poorly) his mental health issues is a valid basis for considering a sentence at or below the Guidelines range. U.S.S.G. §5H1.4. Sentencing courts have the authority to impose below-guideline sentences on the basis of drug addiction. *See U.S. v. Frausto Carlos*, 397 Fed. Appx. 276 (8th Cir. 2010)(unpublished).  The previously untreated mental health issues he suffers from also appear to have contributed greatly to his offenses here, and provide a compelling mitigating circumstance that may warrant downward departure. U.S.S.G. §5H1.3.

Mr. Nguyen should also be approved for RDAP.

    b. **Age and Lack of Criminal History.**

Mr. Nguyen made it to age 50 without a felony conviction. He is in Criminal History Category I. According to a 2017 study by the United States Sentencing Commission, "Older offenders were substantially less likely than younger offenders to recidivate following release." (USSC, "The Effects of Aging on Recidivism Among Federal Offenders" at 3 (2017) www.ussc.gov.) Mr. Nguyen will be in his mid-to-late-50's by the time of his release, and his age is therefore a unique characteristic that tends to reduce the amount of prison time necessary to ensure public safety in the future.

### c. Other Unique Characteristics of Mr. Nguyen.

Mr. Nguyen's life has not been without its struggles, beginning in his early childhood when he experienced domestic violence and was exposed to psychotic episodes in his home. Having lived himself with untreated schizotypal symptoms for most of his life, including audio and visual hallucinations, paranoia, and anxiety, it is a testament to his character and work ethic that he maintained regular employment his entire adult life until the pandemic. His remorse and desire for positive change are palpable, and he is grateful that the government intervened in the "wrong path" he was on. As noted in the PSR, he does not want to return to his former self. The authors of the letters of support filed contemporaneously herewith provide a more complete picture of Mr. Nguyen, who has a kind and gentle nature, not a violent one. When free of delusions and paranoia, he is a compassionate and empathetic person.

### d. Hard Time.

Pretrial detention has been especially difficult for Mr. Nguyen because of the perception of him in the news as a domestic terrorist and virulent racist. The violent attacks and constant threats have made his time in custody even more taxing than Sherburne County Jail can be for many others. As Dr. Boswell notes, the need for constant vigilance and safety in custody has caused a decline in Mr. Nguyen's overall psychological functioning while in custody. As the PSR even notes, "The altercation involved the defendant and his cellmate, and the incident summaries appear generally consistent with the defendant's version as it was noted he was found sitting on the floor with blood on his face and his roommate only sustained injuries to a hand." (PSR at A.2 ¶3.)

15

A modest departure for hard time is therefore appropriate in this case.

## 2. The Nature and Circumstances of the Offense.

### a. These are Possession Offenses.

Mr. Nguyen is before the Court for sentencing on two possession offenses. There is no allegation that Mr. Nguyen was ever violent. Mr. Nguyen has accepted responsibility for his crimes, and has only ever disputed certain details, such as the drug quantity, certain statements attributed to him, and whether he is violent. Mr. Nguyen presents a low risk to future public safety, and 60 months of imprisonment is sufficient but not greater than necessary to protect the public and ensure respect for the law. With proper mental health treatment, and without guns and methamphetamine, Mr. Nguyen will very likely return to being a valuable and contributing member of our community, and his kind-hearted and gentle nature will dominate over his darker impulses.

### b. The Circumstances of this Offense Warrant a Variance from Mr. Nguyen's Guidelines Range - § 3553(a)(1) and (6).

The methamphetamine guidelines are: (1) based on a flawed assumption that purity is a proxy for role in the offense; and (2) that the 10 to 1 methamphetamine purity ratio is not based on empirical evidence. *United States v. Harry*, No. CR 17-1017-LTS, 313 F.Supp.3d 969 (N.D. Iowa, June 6, 2018); *United States v. Ferguson*, No. CR 17-204 (JRT/BRT), 2018 WL 3682509, at *3-*4 (D. Minn. Aug. 2, 2018); *United States v. Kehler,* No. CR 17-196 (DWF/DTS) (Doc. 107) (D. Minn. Aug. 22, 2018). A portion of the scored drugs in this case were based off actual methamphetamine and the Guidelines enhancement therefore. However, Mr. Nguyen

16

also possessed several small baggies of lower purity, or mixture methamphetamine. Additionally, some of the methamphetamine seized was never tested for purity at all.

As the Court is likely well aware, nearly all methamphetamine entering the United States in recent years is of very high purity, and virtually no methamphetamine is manufactured domestically now. Mr. Nguyen's Guidelines range increases dramatically based on the type and purity of drug, e.g. "Ice" or "actual" methamphetamine. Specifically, the PSR calculates Mr. Nguyen's base offense level as 30, driven primarily by the purity of the methamphetamine. (PSR ¶ 14.) Had the methamphetamine all been treated as mixture, his base offense level would be 26. *See* USSG § 2D1.1(c)(3)-(5) & comment. (n.8(D)). It should be noted that Nguyen timely objected to use of the "purity" Guidelines and reserved his right to argue for application of the "mixture" Guidelines in his plea agreement.

The disparity lies with the Guidelines' treatment of high-purity methamphetamine compared to methamphetamine mixtures, employing a 10:1 ratio. *See generally* USSG § 2D1.1(c). This ratio has been roundly criticized in this District and elsewhere, as "based on a flawed premise . . . that drug purity is a proxy for culpability." *United States v. Nawanna*, 321 F. Supp. 3d 943, 945 (N.D. Iowa May 1, 2018). The explanation for this premise appears to be in USSG § 2D1.1, Application Note 27 (c), which states:

> The purity of the controlled substance . . . may be relevant in the sentencing process because it is probative of the defendant's role or position in the chain of distribution. Since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of *unusually pure narcotics* may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs.

This assumption is now a fallacy, as methamphetamine in Minnesota is almost entirely over 95% purity, and nationwide methamphetamine per-gram purity levels averaged above 90 percent, while prices remained low and stable. DEA, *2017 National Drug Threat Assessment* (Oct. 2017), available at

https://www.dea.gov/sites/default/files/2018-07/DIR-040-17_2017-NDTA.pdf (last accessed July 20, 2023) at 69.

"Most of the methamphetamine available in the United States is now produced in Mexico and smuggled across the [border] and is a high-purity, high-potency, low-cost alternative." *Id*. at 73 (explaining that The Combat Methamphetamine Epidemic Act (CMEA) of 2005 has brought domestic methamphetamine laboratory seizures to the lowest level in almost 16 years); *see also United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1254 (D.N.M. 2017) ("the average purity of methamphetamine has increased to over 90 percent while the price per gram has dropped"). The following chart makes this point visually, showing a multi-year trend of methamphetamine averaging purity levels high enough to exceed the Guidelines' 80 percent "Ice" or "pure" threshold. USSG § 2D1.1, Drug Quantity Table. (n.(C)).



| | 1st | 2nd | 1st | 2nd | 1st | 2nd | 1st | 2nd | 1st | 2nd | 1st |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2011 | | 2012 | | 2013 | | 2014 | | 2015 | | 2016 |
| Purity | 92.3% | 93.2% | 95.1% | 94.8% | 95.7% | 96.7% | 96.5% | 96.2% | 95.6% | 97.5% | 95.9% |
| Potency | 75.6% | 77.5% | 85.4% | 90.0% | 93.0% | 93.9% | 94.0% | 89.0% | 86.7% | 88.9% | 90.2% |

SOURCE: DEA METHAMPHETAMINE PROFILING PROGRAM[1]

Whereas the methamphetamine Guidelines once reserved harsher treatment for those exceptional offenders with "pure" methamphetamine, now that is virtually all offenders. The Guidelines are no longer operating as intended in this regard. In recognition of this, courts throughout the country and in this District have rejected the methamphetamine purity Guidelines, correcting the disparity through variances. *See e.g. United States v. Ibarra-Sandoval*, 265 F.Supp.3d 1249, 1256 (D.N.M. 2017) (refusing to punish low level courier "with a sentence intended for high-level criminals"); *see also*

---

[1] *Id.* at 70-71. ("The DEA MPP provides an in-depth chemical analysis of selected methamphetamine samples to establish trends associated with the manufacture of methamphetamine seized primarily in the United States. The MPP further establishes the method used to manufacture methamphetamine, as well as purity levels and other related trends.").

*Ferguson*, No. CR 17-204 (JRT/BRT), 2018 WL 3682509, at *3-*4 (D. Minn. Aug. 2, 2018) (collecting cases and applying the methamphetamine mixture Guidelines despite a determination that the methamphetamine involved was "pure"); *Kehler,* No. CR 17-196 (DWF/DTS) (Doc. 107) (D. Minn. Aug. 22, 2018) (recognizing a policy disagreement with the methamphetamine "actual" base offense level and granting the defendant a generous downward variance from an advisory Guideline range of 210 to 262 months to a term of 110 months, although not strictly applying the methamphetamine mixture base offense level); *United States v. Thielen*, No. CR 17-247(2) (PAM/SER) (D. Minn. Dec. 17, 2018) (ruling that Guidelines disparities arising from methamphetamine purity do not make sense in light of the ubiquity of pure methamphetamine and the comparative sentencing ranges for similarly-dangerous narcotics, and therefore concluding that increasing defendant's sentence based on purity was not an accurate reflection of the offense's seriousness); *United States v. Heisler,* No. CR 18-115 (PJS/LIB) (D. Minn. Jan. 31, 2019) (varying from a Guideline range of 100-127 months to a 67 month sentence based upon, *inter alia,* a policy disagreement with the methamphetamine "actual" Guidelines); *United States v. Quallate,* No. CR 18-223 (PJS/ECW)(Schiltz, J.) (D. Minn. March 7, 2019); *United States v. Norwood,* No. CR  18-152 (JNE/SER) (D. Minn. Feb. 22, 2019) (varying from a Guideline range of 140-175 months to a 108-month sentence on an 21 U.S.C. § 841(b)(1)(B) count based upon, *inter alia*, the Court finding that the "purity-as-proxy-for-culpability" reasoning underlying the methamphetamine "actual" Guideline was no longer a valid basis to use as a starting point for sentencing); *United States v. Lockwood,* No. CR  18-280(2) (MJD/SER) (D. Minn. May 21, 2019) (applying the methamphetamine

mixture base offense level despite laboratory report evidence stating that the drugs in question were "pure" or "actual" methamphetamine); *United States v. Hernandez-Coria,* No. CR 18- 299(1) (SRN/BRT) (D. Minn. July 18, 2019) (varying from a Guideline range of 188-235 months to 164 months based on, *inter alia,* a policy disagreement with the methamphetamine "actual" Guideline); *United States v. Rios Rocha*, No. CR 18-252 (2) (DSD/SER) (D. Minn. Oct. 2, 2019) (Doty, J.) (stating a policy disagreement because the differences between mixture and actual methamphetamine do not justify the Guidelines disparity); *Harry*, No. CR 17-1017-LTS, 313 F.Supp.3d 969 (N.D. Iowa, June 6, 2018); *Nawanna*, 321 F. Supp. 3d 943, 945 (N.D. Iowa May 1, 2018).

In addition to the unjustified sentencing increase in all cases where methamphetamine is tested, Chief Judge Tunheim's sentencing order in *Ferguson* noted the "completely arbitrary" nature of testing in the first instance. *Ferguson*, 2018 WL 3682509, at *4. Testing is performed at the discretion of the Government, but when testing is performed, lab results may be delayed. "That potentially leads to a perverse game of beat the clock, whereby an accused may try to plead guilty and get sentenced before lab results come back, so that his offense is treated as involving a methamphetamine mixture rather than actual/pure methamphetamine. A lab technician's work speed should not determine the number of years a person spends behind bars." *Id.*; *accord United States v. Hartle*, 2017 WL 2608221, at *3 (D. Idaho June 15, 2017)(noting that of the many reasons why methamphetamine purity testing is not performed, none "relate to the defendant's culpability or the danger which he or she poses to society").

The arbitrary nature of those disparities is even more pronounced here, where Mr.

Nguyen had some actual, some mixture, and some un-tested methamphetamine. The BCA lab results for Mr. Nguyen's controlled substances were as follows:

#9.   18.542 ± 0.006 grams containing cocaine hydrochloride

#10.   0.257 ± 0.006 grams containing methylenedioxymethamphetamine (MDMA)

#11.   31.435 ± 0.006 grams containing methamphetamine hydrochloride (94 ±7%)

#12.   0.233 ± 0.006 grams containing methylenedioxymethamphetamine (MDMA)

#13.   36.533 ± 0.006 grams containing methamphetamine hydrochloride (67 ±7%)

#14.   6.790 ± 0.006 grams containing methamphetamine hydrochloride

#15.   14.942 ± 0.006 grams containing methamphetamine hydrochloride (60 ±7%)

#16.   17.400 ± 0.006 grams containing methamphetamine hydrochloride (46 ±7%)

#17.   13.285 ± 0.006 grams containing methamphetamine hydrochloride (74 ±7%)

#18.   63.208 ± 0.006 grams containing methamphetamine hydrochloride (93 ±7%)

#19.   24.285 ± 0.006 grams containing methamphetamine hydrochloride (50 ±7%)

#20.   4.299 ± 0.006 grams containing methamphetamine hydrochloride

#21.   0.066 ± 0.006 grams containing methamphetamine hydrochloride

#22.   0.247 ± 0.006 grams containing methamphetamine hydrochloride

#23.   6.190 ± 0.006 grams containing methamphetamine hydrochloride

#24.   2.822 ± 0.006 grams containing methamphetamine hydrochloride (plastic bag)

The drug analysis in this case only underscores the arbitrary and capricious nature of the ICE or actual methamphetamine guidelines' application. Some of the drugs were not analyzed, some of them were of low purity, and some were of high purity. Nothing about the different baggies and their varied purity levels makes the possessor more or less culpable, nor indicates proximity to the source.

The legion of courts' disagreements with the Guidelines' disparate treatment of "pure" methamphetamine versus mixture have led to the consistent application of the mixture Guidelines in methamphetamine cases, regardless of purity. That should be the

case for Mr. Nguyen. Such an adjustment results in a base offense level of 26. USSG § 2D1.1. The use of the mixture guideline to calculate his base offense level as 26 as a starting place for Mr. Nguyen's sentence will help reduce irrational sentencing disparities produced by the Guidelines' treatment of actual methamphetamine and methamphetamine mixture. This variance from Guidelines is warranted based on the nature and circumstances of the offense.

It should also be noted that that PSR does not calculate Mr. Nguyen's "BOL of 32," as the Government writes, (Doc. 48 at 13), but rather, as 30. PSR at ¶23. It should also be noted that even the Government refers to the drugs possessed as "221.5 grams of methamphetamine mixture," which only serves to further underscore the confusing and arbitrary nature of increasing someone's offense level by four levels based on whether the various small baggies of drugs in their home test over or under 80% purity. (Doc. 48 at 11.) Just like the old crack versus cocaine hydrochloride disparities, these disparities are antiquated, and provide a poor proxy for culpability. Therefore, the Court should vary from the actual methamphetamine adjusted offense level of 29, to the mixture methamphetamine adjusted offense level of 25 as its starting point in fashioning the sentence for Mr. Nguyen in this case.

3.  **The Need for the Sentence Imposed - § 3553(a)(2)(A)-(D): Societal and Institutional Sentencing Needs, and Hard Time.**

Statutory sentencing objectives require that a sentence reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant and provide

the defendant with needed education or vocational training, medical care and other correctional treatment in the most effective manner. 18 U.S.C. 3553(a)(2)(A)–(D).

Federal sentencing practice generally applauds incremental sentencing increases. Mr. Nguyen has never been to prison, and the pretrial detention in this matter already constitutes, by far, his longest term of imprisonment in life. To send Mr. Nguyen away for more than the minimum sentence allowed by law would be to incubate an institutionalized mindset as opposed to incentivize a law-abiding mindset, which Mr. Nguyen has and seeks to maintain.

While the general public must also be deterred by the sentencing of federal defendants, a significant term in BOP custody is not a slap on the wrist. Especially during a pandemic. Because this is Mr. Nguyen's first federal drug conviction, because he is not a career criminal, and because the public must perceive sentencing to distinguish between dissimilarly situated defendants, the minimum sentence allowable by law in this case will serve to deter the public generally from engaging in illegal drug possession and distribution.

A sentence of not more than 60 months will also function, as the parsimony provision intends, to promote general respect for the law. Likewise, as contemplated by § 3553(a), a sentence carefully tailored to the individual defendant promotes respect for the law. Finally, while Mr. Nguyen is eligible for and interested in the BOP's drug-treatment and vocational programs, he should not be sentenced to more than 60 months solely for the purpose of ensuring his inclusion in these programs.

Because Mr. Nguyen is motivated not to re-offend, because it will further the

24

goals of both specific and general deterrence, because it will promote respect for the law, and because the interests of treatment and education should not counsel, on their own, for a longer sentence, Mr. Nguyen respectfully submits that a sentence of not more than 60 months is sufficient, but not greater than necessary to serve the purposes of § 3553(a)(2).

The shortest sentence allowable by law in this case does not let Mr. Nguyen off easy, and constitutes the Government's requested "just desserts" - particularly given it is his first term of imprisonment, and his time in pretrial detention has been especially difficult. 60 months is a just punishment, and more would be excessive.

### 4. Mr. Nguyen's Rehabilitative and Remedial needs, the Need for the Sentence Imposed, and the Kinds of Sentences Available - § 3553(a)(3).

In fashioning an appropriate sentence, the Court is directed to consider society's needs for a sanction that is a just punishment, promotes respect for the law, deters criminal conduct, and reflects the seriousness of the offense, while ensuring the sanction is appropriate for the individual offender before the Court.

As for deterrence, there is little evidence to support the notion of a general deterrent effect of long prison sentences. In fact, the bulk of evidence suggests that there is little to no such impact of harsh sentences. Long sentences simply do not stop others from offending. *See, e.g.,* Valerie Wright, Ph.D., *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment* (Nov. 2010), *available at* https://www.sentencing project.org/wp-content/uploads/2016/01/Deterrence-in-Criminal- Justice.pdf.

With regard to respect for the law, a higher "ice" Guidelines sentence does nothing toward this end. That is because, as described above, the Guidelines range is a not a product

of offense conduct, but of drug purity. No doubt, Mr. Nguyen is responsible for illegal conduct, and that conduct was possessing and selling (small amounts of) drugs. Not manufacturing. Furthermore, he had no choice as to the purity of the drugs. Nearly all methamphetamine seized in the United States is now "pure." The purity of those drugs was not something he controlled. It is a fiction to suggest that a harsher sentence for "pure" methamphetamine drug offenders promotes respect for the law, when those offenders realistically engage in the same conduct as "mixture" methamphetamine offenders. One simply cannot obtain un-pure methamphetamine any longer.

Included in the relevant considerations are possibilities for treatment, education, vocational training, supervised release and imprisonment. Mr. Nguyen is ready, willing and able to participate in drug-treatment and receive any pertinent vocational training available through the BOP. However, because a sentence of not more than 60 months is sufficient to accomplish the goals of sentencing, Mr. Nguyen respectfully requests that drug-treatment program eligibility not be considered as a factor counseling a longer sentence.

The Government expounds on the need to protect the public from Defendant due to his stockpiling of weapons, and prior preoccupation with the rhetoric of a former President and his more obnoxious supporters. Those would perhaps be persuasive arguments with regards to the gun crimes present here, but of course, the Guidelines recommend a much lower sentence on Count 2. Because of offense grouping, the higher Guidelines ranges for drugs are the operative ranges for Mr. Nguyen. Therefore, these arguments may provide a moral reasoning why Nguyen should receive a sentence in the grouped drug Guidelines

ranges (57-71) instead of a firearm-only range (37-46 or 46-57 months), but they are not persuasive arguments why the public needs to be especially protected from Defendant's relatively modest (by comparison) federal drug crimes. The Guidelines already account for all of his conduct, and a sentence at the low end of the adjusted level 25 range for Count 1 using the mixture Guidelines is sufficient but not greater than necessary to protect the public from Mr. Nguyen.

**5. The Sentencing Range Established for the Crime, and Any Pertinent Policy Statements - § 3553(a)(4)-(5).**

The Guidelines were designed to "cabin judicial discretion within narrow procedural and substantive limits." *United States v. Anderson*, 15 F.3d 278, 280 (2nd Cir.1994). However, after *Booker* and its progeny, the Court's discretion is now cabined by reason, experience and wisdom, tempered by the Parsimony provision, and merely informed by the Guidelines. Furthermore, in light of the fact that courts may now depart based solely on the basis of a policy disagreement with Guidelines sentences for particular crimes, such as drug crimes, the lowest sentence allowable by law is sufficient to serve the goals of sentencing, including that of not imposing unduly harsh sentences for relatively less culpable conduct by way lock-step application of the Guidelines.

The policies considerations in this case all counsel in favor of a variance from the Guidelines and imposition of the lowest sentence allowable by law.

**6. Avoiding Unwarranted Sentencing Disparities - § 3553(a)(6).**

In determining an appropriate sentence, a court must ensure the sentence imposed does not create sentencing disparities among similarly-situated offenders. 18 U.S.C. §

27

3553(a)(6). Unwarranted disparities can arise by the presence or absence of Guidelines circumstances that exist in only some districts, *see, e.g., United States v. Jiminez-Perez*, 659 F.3d 704, 707-10 (8th Cir. 2011) (recognizing absence of "Fast Track" program in one district creates an unwarranted disparity; offenders received different sentences based on where they were charged), or by virtue of the Guidelines which themselves create those disparities, *Spears v. United States*, 555 U.S. 261, 266 (2009) ("[D]istrict courts are entitled to reject and vary categorically from the crack cocaine Guidelines based on a policy disagreement with those Guidelines.").

As for Guidelines-based disparities, application of the methamphetamine Guidelines would produce remarkably disproportionate sentencing results. If Mr. Nguyen resided in a district where purity testing did not happen as a matter of course, or where testing results were obtained more slowly, his Guidelines range would be four levels lower. Moreover, the fact is that there is no practical difference between offenders who have pure methamphetamine or methamphetamine mixture—they are similarly situated in all relevant respects, but the Guidelines treat those with pure methamphetamine far more severely. This is an unwarranted sentencing disparity which this Court can correct by refusing to countenance the Guidelines' methamphetamine purity ratio.

Finally, a sentence below an offender's Guidelines range does not itself create any unwarranted disparities. Over the past decade, sentencing courts have regularly varied from guidelines ranges that would have called for prison time in numbers too great to list. In *Gall*, for instance, the Supreme Court confirmed that a sentencing court within this circuit was well within its discretion to give a probationary sentence to a drug conspirator with a

30 to 37 month guidelines range. 552 U.S. at 57-59. A number of other Eighth Circuit cases highlight the appropriateness of imposing sentencing variances in cases where the individual's characteristics warrant such treatment. *See e.g., United States v. Shy*, 538 F.3d 933 (8th Cir. 2008). In order to ensure respect for the law, but also to avoid unwarranted disparities the minimum sentence allowable by law in this case is sufficient, but not greater than necessary.

CONCLUSION

The need to avoid unwarranted disparities due to drug purity counsels the Court to vary from the actual methamphetamine range to the mixture range. The characteristics of Mr. Nguyen, his time in custody, and the nature and circumstances of the offense, as well as all the other 18 U.S.C. § 3553(a) factors, counsel the Court to sentence Mr. Nguyen at the low end of that range. The mandatory minimum commands that 60 months, not 57, is that low end, and also accounts for the Government's concerns.

Mr. Nguyen therefore requests a sentence of 60 months in prison followed, by 48 months of supervised release.

Respectfully submitted,

**ANDREW IRLBECK LAWYER CHTD.**

Dated: July 20, 2023

/s/ Andrew M. Irlbeck
Andrew M. Irlbeck, #392626
First National Bank Bldg.
332 Minnesota Street, Suite W1610
Saint Paul, MN 55101
Phone: 612-986-3895
Fax: 651-223-5179
andrew@irlbecklaw.com
COUNSEL FOR MR. NGUYEN